UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HAROLD HICKS, et al.,

        Plaintiffs,                01 Civ. 10071 (RJH)

       - against -               **MEMORANDUM OPINION
                                   AND ORDER**

MORGAN STANLEY, et al.,

        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiffs petition for court approval of a settlement and plan of allocation, as well as an award of attorneys' fees and expenses in this securities class action brought on behalf of investors in Morgan Stanley Dean Witter Prime Income Trust (the "Trust"). The Settlement and Plan of Allocation are approved, and attorneys' fees and costs are awarded.

### *I. Background*

Plaintiffs allege that between November 1, 1998 and April 26, 2001 (the "Class Period"), defendants disseminated a series of materially false and misleading Prospectuses/Registration Statements ("Prospectuses") and annual reports regarding the net asset value ("NAV") of the Trust. The Trust is a closed-end investment company that invests in floating-rate secured loans made to corporations and business entities. The NAV per share is the price at which shares are bought and sold by the public. The method by which NAV is to be computed is set forth in applicable SEC rules, including Rule 2a-4, promulgated pursuant to § 2(a)(41) of the Investment Company Act of 1940

(15 U.S.C. § 80a-1 *et seq*).  *See Automatic Catering, Inc. v. First Multifund for Daily Income Inc.*, 1981 WL 1664, at *7 (S.D.N.Y. 1981).  Rule 2a-4 provides that the Trust compute the NAV of such loans based on market quotations when such quotations are "readily available," and based upon a "fair value" computation where market quotations are not "readily available."  Where the "fair value" method is used, the SEC's rules require that the "fair value" of a loan must reflect what would be received on its current sale.

Issues raised by this case include whether market quotations were "readily available" during the class period, in which case such prices should have been used by the Trust, or whether the Trust was correct in using "fair value" prices.  In addition, if the "fair value" method was the appropriate method by which to value these loans, then the issue raised is whether the defendants complied with SEC rules mandating how fair value must be calculated.  The alleged failure to follow applicable SEC rules regarding valuation of Trust assets would have the effect of artificially inflating the NAV of the Trust, causing class members to pay higher prices than they would have paid had the assets of the Trust been valued properly.  The Trust phased in its change in pricing methodology (from "fair value" to market pricing), allegedly to prevent class members from realizing the full impact upon NAV that would occur if defendants had used proper valuation methods.

As a result of such events, two class actions were filed against the Trust, Morgan Stanley & Co., Morgan Stanley Dean Witter Advisors Inc., and several trustees, executive officers and/or portfolio managers of the Trust alleging violations of federal securities laws.

By an order of January 30, 2002, the Court (the Hon. Harold Baer, Jr., United States District Judge) consolidated the actions pursuant to the provisions of the Private Litigation Reform Act of 1995 (the "PSLRA"). The Consolidated Amended Class Action Complaint, filed on March 14, 2002, alleges violations of Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act") and a breach of fiduciary duty under state law, on behalf of all persons who purchased or otherwise acquired shares of the Trust between November 1, 1998 and April 26, 2001.

The defendants' motion to dismiss the Securities Act claims was denied on November 13, 2002. On December 1, 2002, the Court issued an order dismissing with prejudice Lead Plaintiffs' claims regarding state law breach of fiduciary duty.

On March 31, 2003, the Court issued a written order formally appointing Nita Bradshaw and Lawrence Nicholson as Lead Plaintiffs (together "Lead Plaintiffs") and approving their selection of Goodkind Labaton Rudoff & Sucharow LLP ("Goodkind Labaton") and a predecessor-in-interest of Lerach Coughlin Stoia Geller Rudman & Robbins LLP ("Lerach Coughlin") as Co-Lead Counsel.

On July 16, 2003, the Court issued an Opinion and Order granting the motion for class certification, appointing Nicholson to serve as class representative and appointing Goodkind Labaton and Lerach Coughlin to serve as class counsel. On October 14, 2003, pursuant to an order by Judge Baer, a Notice of Pendency of this action was mailed to all members of the class who could be identified through reasonable effort. A Summary Notice of Pendency of this action was published in *The New York Times* on October 23, 2003.

On April 19, 2004, following a status conference held on April 12, 2004, this Court issued an order on consent dismissing Lead Plaintiffs' claims under Section 12(a)(2) of the Securities Act with prejudice and without costs, and also issued a pretrial scheduling order, superseding certain scheduling orders previously issued by Judge Baer, and setting a deadline for the completion of expert discovery and a briefing schedule for motions for summary judgment.

Discovery consisted of review and analysis of over 100,000 pages of documents produced by defendants and third parties, review and analysis of electronic files contained on more than a dozen compact disks, review and analysis of prospectuses and other documents filed by the Trust with the SEC, consultations throughout the pendency of the litigation with liability and damages experts retained by Lead Plaintiffs, depositions of ten Morgan Stanley witnesses, including the portfolio managers and certain trustees of the Trust, and inclusion in the record of depositions of third-party witnesses who had testified in an unrelated securities class action with similar allegations.

In January 2004, after fact discovery was completed and expert reports were submitted, the parties agreed to participate in non-binding mediation before the Hon. Daniel Weinstein, retired Judge of the Superior Court of California, under the auspices of Judicial Arbitration and Mediation Services, Inc. ("JAMS"). In accordance with Judge Weinstein's procedures, plaintiffs and defendants exchanged comprehensive mediation statements, and the parties submitted a two-volume joint appendix of exhibits. The mediation was held on March 10 and 11, 2004, at JAMS's New York offices. Lead Plaintiffs and defendants each made presentations to Judge Weinstein in the presence of all parties and counsel for defendants' insurance carriers, and proceeded to engage in

negotiations. Although the parties negotiated in good faith, no agreement was reached at that time.

Following the mediation, the parties engaged in continued negotiations with the assistance of Judge Weinstein. Several demands, offers, and counter-offers were communicated. On June 21, 2004, the parties reached an oral agreement-in-principle to settle the action. The parties then negotiated a letter agreement to memorialize the agreement-in-principle, which was signed on June 29, 2004. On June 30, 2004, the parties advised the Court that they had reached an agreement-in-principle and would submit a Stipulation of Settlement to the Court for approval. On October 19, 2004, this Court received the Stipulation of Settlement.

*Settlement Terms*

The Stipulation of Settlement provides for a gross payment of $10,000,000 in cash (the "Settlement Fund"). In addition to paying claims to class members, the Settlement Fund will be used to pay taxes, administrative costs of the class action, including the costs of providing notice, and attorneys' fees and expenses. The resulting Net Settlement Fund will then be distributed to claimants according to the Plan of Allocation.

In addition to the financial provisions, the settlement also contains a release and waiver, barring participating class members from bringing any future claims, known or unknown, against any defendant in the action, for matters relating to the settlement, except such actions as may be necessary to enforce the terms of the settlement or the final judgment. This release specifically includes a waiver by the parties of the provisions of Section 152 of the Civil Code of the State of California and similar provisions available

in other jurisdictions, which provide that a general release does not release unknown claims.

Plaintiffs moved for preliminary approval of the settlement on November 15, 2004. On December 9, 2004, following a hearing, this Court issued an Order Preliminarily Approving Proposed Settlement, Directing the Issuance of Notice to the Class, and Setting a Fairness Hearing (the "Preliminary Approval Order").

*Notice to the Class*

In the Preliminary Approval Order of December 9, 2004, the Court preliminarily approved the settlement on the terms set forth in the Stipulation, scheduled a hearing for May 26, 2005 to determine whether the settlement and plan of allocation were fair, reasonable, and adequate, whether a final judgment should be entered, and whether an application by co-Lead Counsel for attorneys' fees and reimbursement of expenses should be granted.

The Court approved the form and substance of the Notice of Proposed Settlement of Class Action and Fairness Hearing (the "Notice"), which was mailed to approximately 100,000 class members; the Summary Notice of Proposed Settlement of Class Action and Fairness Hearing (the "Summary Notice"), which was published in *The New York Times* on March 31, 2005, and on a widely-circulated national wire service; the Special Notice to Class Members Who Previously Requested to be Excluded from the Class and Form of Request for Revocation of Exclusion (the "Special Notice"); and the Claim Information Form.

The Notice, sent pursuant to Fed. R. Civ. P. 23(e)(1)(B), provided descriptions of the action and the proposed settlement, detailed the circumstances of the settlement, and

6

outlined the plan of allocation. In addition, the Notice furnished instructions for class members regarding the submission of claims, objections to the settlement, and attendance at the fairness hearing. The Notice further provides that Co-Lead Counsel will apply for attorneys' fees not to exceed thirty-three and one-third percent (33.3%) of the Settlement Fund, and reimbursement of expenses, exclusive of notice and administration costs, of no greater than $500,000, and provides that class members have the opportunity to contest counsels' request for attorneys'fees and reimbursement of expenses, in addition to contesting the terms of the settlement.

*The Reaction of the Class to the Notice of Proposed Settlement*

The overall response of the class to the settlement has been positive. In response to the original Notice of Pendency, 123 investors opted out of the class out of approximately 100,000 potential class members. The Special Notice gave such opt-outs an opportunity to rejoin the class, and, as a result, 19 of the 123 opt-outs elected to rejoin the class and reinstate their right to participate in the settlement. Furthermore, as of May 18, 2005, over 50,000 class members have submitted signed Claim Information Forms. The high level of participation in the proposed settlement and the speedy submission of Claim Information Forms signify a high level of approval by class members of the settlement.

In addition, as of May 5, 2005, the deadline for filing objections to the settlement, plan of allocation, or application for attorneys' fees and expenses, only three persons, Rudolph Wishner, Cecelia Villarreal, and Lawrence Smith, have objected to the settlement. For the reasons stated below, the Court overrules the individual objections and concludes that the settlement amount is fair and reasonable.

*The Fairness Hearing*

On May 26, 2005, the Court held a fairness hearing. Counsel spoke in favor of the settlement and no member of the class or shareholder attended and spoke against the settlement. Co-Lead Counsel addressed the Court in support of their applications for attorneys' fees and expenses as well.

## *II. Discussion*

Rule 23(e) of the Federal Rules of Civil Procedure requires court approval of any settlement of a certified class action. While public policy favors the settlement of class actions, *In re Interpublic Securities Litigation,* 2004 WL 2397190, at *7 (S.D.N.Y.), the district court must nevertheless "carefully scrutinize the settlement to ensure its fairness, adequacy and reasonableness, and that it was not a product of collusion." *D'Amato v. Deutsche Bank,* 236 F.3d 78, 85 (2d Cir. 2001) (citation omitted). This determination is a matter addressed to the Court's discretion. *See Joel A. v. Giuliani,* 218 F.3d 132, 139 (2d Cir. 2000) (great weight accorded to trial judge's views of fairness of settlement). In determining the settlement's fairness, the court must "eschew any rubber stamp approval" yet simultaneously "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 462 (2d Cir. 1974) (*abrogated on different grounds by Goldberger v. Integrated Reserves, Inc.,* 204 F.3d 43 (2d Cir. 2000)). *See also In re Interpublic Securities,* 2004 WL 2397190, at *6-7.

A district court must review both the procedural and substantive fairness of a proposed settlement. *D'Amato,* 236 F.3d at 85; *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,

396 F.3d 96, 116 (2d Cir. 2005).  Procedural fairness is established by examining the negotiating process "to ensure that the settlement resulted from arm's-length negotiations and that plaintiffs' counsel have possessed the experience and ability necessary to effective representation of the class's interests."  *D'Amato* 236 F.3d at 85 (citation omitted).  "The experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves" shed light on the fairness of the negotiating process.  *Malchman v. Davis,* 706 F.2d 426, 433 (2d Cir. 1983) (citation omitted).

The standards governing the substantive fairness of a settlement in this Circuit are the well-established "*Grinnell* factors," including:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*D'Amato,* 236 F.3d at 86 (originally enumerated in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)).  To find the settlement fair, the Court need not find that every factor weighs in favor of the settlement; the court "considers[s] the totality of these factors in light of the particular circumstances." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (citation omitted).

The record amply supports the procedural fairness of the settlement in this case. In January 2004, after plaintiffs completed document and deposition discovery, and the parties' expert witnesses submitted their reports, the parties agreed to participate in non-binding mediation before the Honorable Daniel Weinstein, a retired California judge and JAMS neutral. The participation of a respected and neutral mediator "gives [the court] confidence that [the negotiations] were conducted in an arms-length, non-collusive manner. *In re AMF Bowling Sec. Litig.,* 334 F.Supp.2d 462, 465 (S.D.N.Y. 2004); *see also In re WorldCom, Inc. ERISA Litig.,* 2004 WL 2338151, at *6 (S.D.N.Y. 2004). Counsel attended two days of mediation on March 10 and 11, 2004. Although offers and counter-offers were made, negotiations at that time broke down and mediation was unsuccessful. A breakdown in settlement negotiations can tend to display the negotiation's arms-length and non-collusive nature. *Denney v. Jenkens & Gilchrist,* 2005 WL 388562, at *14 (S.D.N.Y. 2005). In June 2004, six months after the parties first agreed to discuss settlement, the parties reached an agreement-in-principle. Able and experienced counsel in class action and securities litigation represented both sides in reaching this settlement and further supports its fairness to the class. *Wal-Mart,* 396 F.3d at 116 (*citing Manual for Complex Litigation, Third,* § 30.42 (1995)) ("A 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's length negotiations between experienced, capable counsel after meaningful discovery.'").

Based on a review of the relevant *Grinnel* factors, the Court also concludes that the substantive terms of the settlement are fair, adequate, and reasonable.

The complexity, expense, and duration of continued litigation likely would be considerable.  Securities class actions are often "difficult and… uncertain."  *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999) (citation omitted), and this case is no exception.  The issues presented in the litigation, such as determining the correct value for senior bonds and whether or when market quotations for such bonds reliably indicated the correct value, are complex and highly disputed.  Further litigation would necessarily involve further costs; justice may be best served with a fair settlement today as opposed to an uncertain future settlement or trial of the action.

The reaction of the class to the settlement strongly supports approval.  Out of the approximately 100,000 members and potential members of the class, only 123 initially opted-out, of whom 19 rejoined the class after announcement of the preliminary settlement.  Only three persons have objected to the settlement.  The objectors, Mr. Wishner, Ms. Villarreal, and Mr. Smith, object to the amount of the settlement, arguing that it is too low.  However, there are obstacles that the plaintiffs would face in continued litigation with defendants, and it is uncertain whether they could overcome these obstacles to prove both liability and damages.  The settlement amount represents a fair payment to plaintiff class due to the risk that protracted litigation may be fruitless. Objector Wishner's request to allow class members to sue Morgan Stanley individually, seemingly a request to allow another opt-out period after the settlement has been proposed, is denied.  It is not feasible for individual litigants to sue Morgan Stanley directly because few investors have suffered losses great enough to make it worthwhile for them to individually expend resources in a suit.  Consequently, an additional opt-out opportunity is not appropriate under Fed.R.Civ.P. 23(e)(3).

Fairness is also indicated by the fact that the settlement was reached after thorough discovery, including substantial document review and the depositions of ten Morgan Stanley witnesses. Therefore, plaintiffs were able to make an informed judgment as to the likelihood of success at trial when entering into this settlement.

That judgment necessarily reflected the risk that plaintiffs would not prevail in establishing liability at trial. While counsel believed their claims had merit, defendants interposed substantial defenses. For example, defendants contended that market quotations for each of the several hundred loans in the Trust's portfolio were neither "reliable" nor "readily available" throughout the class period, and, therefore, that a "fair value" analysis was appropriate. Resolution of these issues will turn on a "battle of the experts" as to proper methods of valuation over an extended period of time and creates a significant obstacle to plaintiffs in establishing liability. *In re Global Crossing,* 225 F.R.D. at 459; *In re Interpublic Securities,* 2004 WL 2397190 at *7.

In addition, plaintiffs face substantial risks in establishing the extent of any damages at trial. Plaintiffs' expert aggressively calculates damages of $265.8 million based on the total decline in the Trust's NAV. However, defendants' experts point out that this calculation fails to account for declines in NAV attributable to external market conditions, including increasing default and bankruptcy rates and widening spreads. Taking these adverse factors into account would, in their opinion, reduce recoverable damages to a maximum of $40.9 million assuming that liability had been established on every day of the class period. Which expert would be believed by a jury – and to what extent – is highly unpredictable. It is reasonable to conclude, however, that a jury would give substantial weight to the effect of independent market developments that would

negatively impact the Trust's NAV.  Under these circumstances a settlement of $10 million (24.4% of Defendants' estimate and 3.8% of Plaintiffs' estimate) is within the range of reasonableness for post-PSLRA securities class action settlements.  *See* Laura E. Simmons & Ellen M. Ryan, *Post-Reform Act Securities Lawsuits:  Settlements Reported through December 2003*, at 5 (attached as Exhibit F to the Affidavit of David J. Goldsmith ("Goldsmith Aff.") dated May 18, 2005 and also available at http://www.businessforum.com/Cornerstone_01.html).

*The Plan of Allocation of the Net Settlement Fund*

In approving an allocation plan, the Court must ensure that the distribution of funds is fair and reasonable.  *In re Global Crossing*, 225 F.R.D. at 462 (*citing Maley v. Del Global Tech. Corp.,* 186 F.Supp.2d 358, 367 (S.D.N.Y. 2002)). When formulated by competent and experienced class counsel, an allocation plan need have only a "reasonable, rational basis." *Id.*; *In re Am. Bank Note Holographics, Inc. Sec. Litig.,* 127 F.Supp.2d 418, 429-30 (S.D.N.Y. 2001).

The plan of allocation is based on the amount of alleged overpricing of the daily NAV per share of the Trust during the class period as calculated by counsel with the assistance of an economic consultant, Forensic Economics, Inc.  The Net Settlement Fund will be distributed to all class members who submit acceptable claim information forms and did not exclude themselves ("authorized claimants").  Each authorized claimant's pro rata share of the Net Settlement Fund will be determined by the Claims Administrator based upon each claimant's "Recognized Loss."  The "Recognized Loss" will be calculated in one of two ways: for shares of the Trust that were purchased during the class period and still held as of the end of the class period, the Recognized Loss per

13

share is equal to the alleged overpricing on the day of purchase; for shares of the Trust that were purchased during the class period and sold before the end of the class period, the Recognized Loss per share is equal to the difference between the alleged overpricing on the day of purchase and the overpricing on the day of sale.  Such distribution based on investment loss is reasonable.  *Global Crossing,* 225 F.R.D. at 462.  Furthermore, the plan of distribution was fully disclosed in the class notice, and there have been no objections to the plan.

*Attorneys' Fees and Reimbursements*

"Where an attorney creates a common fund from which members of a class are compensated for a common injury, the attorneys who created the fund are entitled to 'a reasonable fee—set by the court—to be taken from the fund.'"  *In re Interpublic Securities*, 2004 WL 2397190 at *10 (citations omitted).  Such fee must be "reasonable" under the circumstances.  *Goldberger v. Integrated Resources, Inc*., 209 F.3d 43, 47 (2d Cir. 2000).

A reasonable attorneys' fee may be calculated one of two ways.  Using the percentage method, the court sets some percentage of the recovery as a fee.  The percentage of the settlement to be allocated to the attorneys depends on a number of factors present in the litigation, discussed below.  The lodestar method of apportioning attorneys' fees involves multiplying the hours reasonably billed to the case by the appropriate hourly rate, and then, in the court's discretion, applying a multiplier to compensate the attorneys for factors such as the underlying risk and complexity of the litigation.  *Id.*

The Second Circuit has declared that both the percentage and lodestar methods are permissible methods of calculating attorneys' fees in common fund cases. *Id.* Whether the reasonable attorney's fees are determined by the percentage or lodestar methods, the reasonableness of the fee is guided by consideration of factors such as "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation …; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy." *Id.* at 50 (citation omitted).

The trend in the Second Circuit recently has been to use the percentage method. *See Wal-Mart Stores,* 396 F.3d at 121; *In re Global Crossing,* 225 F.R.D. at 465. The percentage method, though not without flaws, is often preferable to the lodestar method to determine attorneys' fees in class actions because it reduces the incentive for counsel to drag the case out to increase the number of hours billed; also, fewer judicial resources will be spent in evaluating the fairness of the fee petition. *In re Lloyd's American Trust Fund Litig.*, 2002 WL 31663577, at *25 (S.D.N.Y. 2002) (citation omitted). In addition, the PSLRA contains support for the percentage method. *See* 15 U.S.C. § 78u-4(a)(6) ("attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class").

Attorneys' fees will be determined in this action using the percentage method. The court will then examine what the attorneys' fees would be under the lodestar method to act as a "cross-check" on the percentage method to further ensure reasonableness. *See Goldberger*, 209 F.3d at 50 ("The lodestar remains useful as a baseline even if the

15

percentage method is eventually chosen. Indeed, [the Second Circuit] encourage[s] the practice of requiring documentation of hours as a 'cross check' on the reasonableness of the requested percentage.").

Co-Lead Counsel, pursuant to Fed. R. Civ. P. 23(h) and 54(d)(2), moved for attorneys' fees of 30% of the Settlement Fund of $10,000,000, or $3,000,000, plus reimbursement of $727,433.82 for expenses. Counsel expended considerable time and effort, spanning over two years, preparing to litigate this case and leading to the settlement. Counsel deposed ten Morgan Stanley witnesses, consulted with experts, reviewed thousands of pages of documents, and prepared settlement papers and notices for the settlement class after successful negotiations. In this context, a 30% fee award, cross-checked against a lodestar calculation, constitutes a reasonable fee. The expenses are also reasonable given the amount and quality of work performed by Co-Lead Counsel, their experts, and claim administrator.

The 30% fee is consistent with fees awarded in comparable class action settlements in the Second Circuit. *See Maley v Del Globals Techs. Corp.*, 186 F. Supp.2d 358, 370 (S.D.N.Y. 2002) (awarding 33 1/3% of settlement valued at $11.5 million); *In re Warnaco Group, Inc. Securities Litig.*, 2004 WL 1574690, at *3 (S.D.N.Y. 2004) (awarding 30% of $12.85 million settlement). As the size of the settlement fund increases, the percentage of the fund awarded as fees often decreases so as to prevent a windfall to plaintiffs' attorneys. *In re Interpublic*, 2004 WL 2397190, at *11 (citation omitted). A settlement amount of $10 million does not raise the windfall issue in the same way as would a $100 million settlement, and a 30% fee does not produce such a windfall. *See* Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action*

*Settlements: An Empirical Study,* J. Empirical Legal Stud. 27 (2004), attached as Exhibit A to Goldsmith Affidavit (mean percent fee for settlement between $9.7 million and $15 million is 28%).

Percentage-of-recovery awards of attorneys' fees are appropriate even though such awards are often greater than those awards that would be granted to attorneys under the lodestar method (without applying a multiplier). The attorneys take upon themselves the risk that litigation will not be successful, including the risks of non-reimbursed expenditures and the opportunity cost of attorney time dedicated to the case. The risk of success in the litigation effort may be the most important factor to be considered in determining a reasonable attorneys' fee. *In re Global Crossing*, 225 F.R.D. at 467 (citation omitted). Attorneys in contingency cases reasonably should expect higher fees than would be had if they were guaranteed such fees up-front whether or not the party receives any relief.

Public policy considerations support the requested fee. Private actions to redress real injuries further the objectives of the federal securities laws by protecting investors and consumers against fraud and other deceptive practices. *Eltman v. Grandma Lee's, Inc.*, 1986 WL 53400, at *9 (E.D.N.Y. 1986). Such actions could not be sustained if plaintiffs' counsel were not to receive remuneration from the settlement fund for their efforts on behalf of the class. *Id.* Due to the dispersed, and relatively small, losses among a large pool of investors, the class action mechanism and its associated percentage-of-recovery fee award solve the collective action problem otherwise encountered by which it would not be worthwhile for individual investors to take the time and effort to initiate the action. "To make certain that the public is represented by

talented and experienced trial counsel, the remuneration should be both fair and rewarding. The concept of a private attorney acting as a private attorney general is vital to the continued enforcement and effectiveness of the Securities Acts." *Id.*  A percentage-of-recovery award above the unmodified lodestar is thus appropriate.

The reasonableness of a 30% fee award is also supported by a "cross-check" against a lodestar calculation.  Where the lodestar method is simply used as a "cross-check," the court does not need to scrutinize counsel's documentation of hours expended on the case in the same depth as is appropriate where the lodestar is used as the sole fee determination. *Goldberger*, 209 F.3d at 50.  The lodestar is calculated by multiplying the number of hours expended on the litigation by the attorney or paralegal by the current hourly rate for such individual.  Current "market rates" are proper because such rates more adequately compensate for inflation and loss of use of funds. *Missouri v Jenkins*, 491 U.S. 274, 283-84 (1989).

Co-Lead Counsel spent 3,983.05 hours working on this action as of April 30, 2005, resulting in a combined lodestar of $1,623,033.75. *(Goldsmith Aff., ¶ 5)*. When the lodestar method of fee computation is used in class action litigation, a multiplier is usually applied to the lodestar. *In re Global Crossing,* 225 F.R.D. at 468.  "The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." *Id*. at 468 (*citing Goldberger*).  Co-Lead Counsel's lodestar of $1,623,033.75 and the $3 million fee requested represents a multiplier of 1.85

Taking the circumstances of the case into consideration, a multiplier of 1.85 is reasonable and, as a "cross-check," supports counsel's fee application.  In this Circuit,

contingency fees of 1.85 times the lodestar and greater have been deemed reasonable by the courts. *See In re Interpublic Securities*, 2004 WL 2397190, at *12 (approving 12% fee representing multiplier of 3.96 times lodestar and noting that "[I]n recent years multipliers of between 3 and 4.5 have been common in federal securities cases") (citation omitted). Plaintiff's counsel further supports the notion that a multiplier of 1.85 is reasonable by providing numerous examples of Southern District decisions where multipliers in excess of 1.85 were approved under comparable circumstances. *See Memorandum of Law in Support of Co-Lead Counsel's Motion for an Award of Attorney's Fees*, pp. 21-22.

Co-Lead Counsel's requested fee reimbursement in the amount of $727,433.82 for out-of-pocket expenses incurred in connection with this action is also approved. "Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients." *In re Independent Energy Holdings PLC Securities Litigation*, 302 F.Supp.2d 180, *183 n.3 (S.D.N.Y. 2003) (citation omitted). The expenses incurred by Co-Lead Counsel include such expenses as expert witness fees, claims administrator fees, and other expenses necessary to the litigation and settlement of this action. *See Goldsmith Affidavit, Exhibits C and D.*[1]

Finally, the court approves the reimbursement of expenses to lead plaintiff Nicholson pursuant to plaintiff's motion. Nicholson spent considerable time discharging his responsibilities as lead plaintiff and class representative. The PSLRA permits lead plaintiffs to recover reasonable costs and expenses related to their representation of the

---

[1] The Notice of Settlement advised the class that counsel would apply for reimbursement of expenses (exclusive of settlement notice and administration costs) not to exceed $500,000. Expenses exclusive of settlement notice and administration costs amount to $384,853.43, well within the cap referred to in the Notice.

class. 15 U.S.C. § 78u-4(a)(4). Courts in this Circuit routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place. *See, e.g., In re Worldcom, Inc. ERISA Litig.*, 2004 WL 2338151, at *11 (awarding the three named plaintiffs $5,000.00 each); *Dornberger v. Metropolitan Life Ins. Co.*, 203 F.R.D. 118, 124 (discussing incentive awards) (S.D.N.Y. 2001).

### *III. Conclusion*

The Settlement and Plan of Allocation is approved. Counsel is awarded attorneys' fees in the amount of $3,000,000 and expenses in the amount of $727,433.82. Lead plaintiff Nicholson is awarded $7,500 for reasonable costs and expenses.

SO ORDERED.

Dated: New York, New York
October 19, 2005

                                                                          _____
                                                                          Richard J. Holwell
                                                                          United States District Judge